USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAY 06 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                          :
SAM SINAY, individually and on behalf of   :
all others similarly situated,                          :
                                                          :        12 Civ. 1513 (KBF)
                                      Plaintiffs,     :
              -v-                                         :        MEMORANDUM
                                                          :        DECISION & ORDER
                                                          :
CNOOC LIMITED,                                  :
                                                          :
                                      Defendant.[1]  :
                                                          :
------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

In June 2011 two oil drilling platforms in the Bohai Bay off the northeastern coast of China experienced certain anomalies relating to "water injection" and "cuttings reinjection." These anomalies lead to abnormal and dangerous levels of system pressure, which caused oil spills to begin deep underwater and in the seabed itself. Over the course of several months, the spill released over 3,000 barrels of oil into the sea, spreading over 320 square miles, and causing widespread ecological devastation.

The company that owns the two drilling platforms is defendant CNOOC Limited ("CNOOC"). CNOOC's public securities filings and press statements from the months before the spill, inter alia, lauded CNOOC's commitment to safety measures--especially in light of the Deepwater Horizon disaster in the Gulf of

---

[1] On April 3, 2013, plaintiffs voluntarily dismissed former defendants Yang Hua and Zhong Hua from this action. (ECF No. 30.) Accordingly, the only remaining defendant is CNOOC Limited.

1

Mexico which had occurred just over one year prior.  And after the spill, CNOOC's press statements, <u>inter alia</u>, emphasized that it and its partners had the spill under control.  Lead plaintiff Sam Sinay brings this putative class action under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b),  and Exchange Act Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, alleging that those statements--and others made between January 27, 2011, and September 16, 2011--were untrue and fraudulent.  Sinay seeks to represent a class of purchasers of CNOOC's American Depositary Shares ("ADSs") during that period.

CNOOC now moves to dismiss on several grounds.[2]  For the reasons set forth below--and specifically because plaintiffs fail to adequately plead scienter--CNOOC's motion is GRANTED in its entirety; and this action is dismissed with prejudice.

---

[2] Plaintiffs filed this action on February 29, 2012. (ECF No. 1.)  On November 29, 2012, plaintiffs amended their complaint. (ECF No. 19.)  CNOOC moved to dismiss on December 21, 2012. (ECF No. 20.)  During a status conference held on February 20, 2013, the Court explicitly gave plaintiffs one additional opportunity to amend their complaint, having at that point seen the arguments made by CNOOC in support of its motion to dismiss.  The Court also noted that any disposition of the pending motion--<u>i.e.</u>, if plaintiffs elected not to again amend--would be final, and that should the Court dismiss the complaint, such dismissal would be with prejudice and no further amendment would be allowed.  Plaintiffs' confirmed these statements in a letter to the Court following that conference, and elected to not further amend their complaint in light of CNOOC's arguments. (<u>See</u> ECF No. 26.)

2

BACKGROUND

For purposes of the current motion, the following facts--drawn from the operative complaint, the documents incorporated by reference therein, and public securities filings--are taken as true.

CNOOC is one of the largest oil producers in the world. (ECF No. 19 ("Compl.") ¶ 23.) It is a subsidiary of a Chinese company wholly owned by the Chinese government. (Id. ¶¶ 3, 11, 23.) For fiscal year 2010, CNOOC's net oil production was 328.8 million barrels. (Id. ¶ 42.)

CNOOC owns fifty-one percent of an oil field known as "PL 19-3" in the Bohai Bay off the coast of northeastern China. (Id. ¶ 3.) Prior to the oil spill that spawned this action, PL 19-3's operations accounted for ten percent of CNOOC's domestic oil production and nine percent of CNOOC's total oil production. (Id. ¶ 26.) The remaining forty-nine percent of PL 19-3 is owned by ConocoPhillips China Inc. ("Conoco"), which operates PL 19-3 on a day-to-day basis. (Id. ¶ 3.) Both CNOOC and Conoco have representatives on PL 19-3's "joint management committee," which reviews and approves certain matters relating to the development of PL 19-3, including an "overall development plan." (Id. ¶ 27.)

**Pre-Spill Statements**

The class period begins on January 27, 2011. (Id. ¶ 1.) On that date, CNOOC issued a press release stating that it expected to reach oil production of 355 to 365 barrels in 2011. (Id. ¶ 41.) The press release also stated that CNOOC would "see a year of steady growth in 2011." (Id.)

Three months later, on March 23, 2011, CNOOC issued a press release summarizing its financial results from fiscal year 2010.[3] In that press release, CNOOC lauded its "outstanding operational and management capabilities." (Id. ¶ 42.) Moreover, in a conference call related to the release of its fiscal 2010 financial results, CNOOC's CEO emphasized CNOOC's commitment to health, safety, and environmental protection ("HSE"), stating that CNOOC "will continue to focus on HSE in 2011." (Id. ¶ 43.)

CNOOC's public securities filings continued to emphasize its commitment to HSE through the first half of 2011. In a filing from April 8, 2011, CNOOC noted its "comprehensive management system," and employees' "risk identification and risk management skills." (Id. ¶ 46.) The filing went on to note that CNOOC "continues to enhance the risk identification and control on HSE and try [sic] to identify and prevent the key potential risks in advance." (Id.) Indeed, explicitly mentioning the Deepwater Horizon oil spill in the Gulf of Mexico in 2010, the filing stated that CNOOC was inspecting its operations "to prevent the risks embedded in the operation of drilling, development and production[, and that the] proper measures have been performed to cope with potential risk identified." (Id.) CNOOC's annual report for fiscal 2010--released on April 29, 2011--further emphasized its HSE commitment. The report stated that CNOOC had "conducted comprehensive environmental impact evaluations and adopted emergency plans to deal with potential oils spills" at all of CNOOC's operational locations; and noted that

---

[3] CNOOC's fiscal year ends on December 31 of the year in question. See CNOOC LTD, Report of Foreign Private Issuer (Form 6-K) Ex. 99.2 (Mar. 24, 2011).

CNOOC "believe[d] that [its] environmental protection systems and facilities compl[ied] with applicable national and local environmental protection regulations." (Id. ¶¶ 49, 50.)

Plaintiffs allege that CNOOC's statements from January 27, 2011--the first day of the class period--to April 29, 2011--the date of the last allegedly false statement prior to the oil spill--were false and misleading because (1) PL 19-3 was being operated in an unsafe manner not in compliance with applicable regulations; (2) the operation of PL 19-3 created significant HSE risks; (3) PL 19-3's unsafe and risky operations undermined any laudation concerning its "outstanding" capabilities; and (4) CNOOC's risk- and emergency-management measures were, in fact, generally inadequate. (See id. ¶¶ 47, 51.)

**The Oil Spill**

On June 2, 2011, an oil well in "Platform B" of PL 19-3 began "experience[ing] anomalies" due to increased "water injection" and decreased "injection pressure." (Id. ¶ 29.) Instead of suspending water injection, the well "maintained pressure and continued the water injection, which resulted in high pressure in certain water injection zones and the opening of an existing geological fault." (Id.) This caused an underwater oil spill on June 4, 2011. (Id. ¶¶ 29, 35) Plaintiffs allege that this oil well's water injection procedures had been in violation of PL 19-3's overall development plan for some time. (Id. ¶ 30.)[4] Nor, allegedly, were pressure-monitoring procedures adequate or followed. (Id. ¶ 31.)

---

[4] The complaint does not attempt to define or explain the technical oil industry terms it uses, nor does it attempt to explain why certain actions should have been taken instead of others. Thus, the

Weeks later, on June 17, 2011, a second oil spill occurred under PL 19-3's "Platform C." (Id. ¶ 35.) This spill was caused because the well's "cuttings reinjection layer was moved upward several times until it was too close to the oil layer . . . generat[ing] ultra-high pressure which led to well overflow . . . [and] an undersea oil spill," and later also a "seabed oil spill." (Id. ¶¶ 32, 33.)[5] As with the Platform B spill, emergency-response procedures were allegedly both inadequate and ignored. (Id. ¶ 33.)

The first official[6] public disclosure of the PL 19-3 oil spills occurred on July 5, 2011, via a press release issued by the Chinese offshore oil drilling regulator--the State Oceanic Administration ("SOA"). (Id. ¶¶ 2, 36.)[7] The SOA--not CNOOC-- explained that its release of information regarding the oil spills had followed the spills by several weeks because SOA had been ensuring its information was

---

Court is at a loss, for example, regarding what "water injection" is or does in oil production, why water injection allegedly should have been terminated in this case, or why water injection is related to system pressure. As a more concrete example, to the extent the following paragraph has any significance other than that Platform B's oil well had been operated wrongfully for some time, it is lost on the Court:

> In violation of the overall development plan, Well B-23 had been executing commingled water injection **for a long time** without any zonal water injection. By neglecting the differences of pressure from multiple sets of oil layers, only the pressure supply of under-pressured layers was taken into consideration. The result was high-pressure risks due to water injection into individual oil layers.

(Compl. ¶ 30 (emphasis in original).)

[5] See note 3, supra.

[6] The complaint alleges that on June 21, 2011, an unofficial "microblogger" in fact reported that oil spills had occurred in two wells in the Bohai Bay. (Compl. at 10 n.2.)

[7] The facts concerning the "hows" and "whys" of the oil spills summarized infra were contained in a report (the "SOA Report") issued by SOA in June 2012, long after this action's class period closed on September 16, 2011. (Compl. ¶¶ 1, 2, 36, 79.) The SOA Report concluded that, in plaintiff's words, CNOOC and Conoco had "no[t] [taken] necessary precautionary measures . . . regarding foreseeable risks. (Id. ¶ 34.)

6

"detailed, verified, objective and accurate," and that its initial information was "not sufficient to meet [SOA's] criteria for such disclosure." (Id. ¶ 37.) The SOA executive explaining the delay concluded: "To avoid unnecessary panic or qualms, we believed we determined in what scope and to what extent, that these information [sic] should be revealed to the public." (Id.) The complaint additionally cites several news articles which criticized SOA--not CNOOC--due to the delay in releasing the information; but it also quotes the "chief information officer of China Energy Network," who noted that "despite that CNOOC was not the No. 1 – liable party, it nonetheless had duties to urge its operating company [Conoco] to reveal relevant information at its earliest possibility." (Id. ¶ 38.)

### Post-Spill Statements

CNOOC's first public statements about the oil spills were pursuant to a press release on July 6, 2011--the day after SOA issued its press release. CNOOC's July 6, 2011 press release stated that the PL 19-3 oil spills were "basically under control . . . well controlled on [June 21]." (Id. ¶ 53.) The press release also described the Platform B spill as "a seepage of oil from the seabed," and described the Platform C spill as "a small-scale influx, resulting in another spill." (Id.) It stated that "[a]s of July 4, there is no obvious oil slick on the sea surface[, and] a very small amount of oil sheen can be observed occasionally near Platform B and C." (Id.) The release concluded that CNOOC would "urge and assist" Conoco in clean-up efforts. (Id.)

On July 13, 2011, CNOOC issued another press release--this one announcing that SOA was requiring Conoco to suspend oil production at Platforms B and C of

PL 19-3. (Id. ¶ 55.)  This suspension decreased CNOOC's oil production by approximately 22,000 barrels per day.  (Id. ¶ 65.)  CNOOC further reported that Conoco had observed a "thin sheen" of oil near Platform B, and "bubbles" from the "oil-based mud on the sea floor" near Platform C.  (Id. ¶ 55.)  The release again concluded that CNOOC would "continue to urge and assist" Conoco in clean-up efforts.  (Id.)

On July 15, 2011, CNOOC issued another press release.  This one stated that Conoco's "current estimate of the aggregate amount of fluid spilled from the two [PL 19-3 oil spills] is approximately 1,500 barrels . . . of oil."  (Id. ¶ 56.)  The release once again concluded that CNOOC would "continue to urge and assist" Conoco in clean-up efforts.  (Id.)  However, on August 12, 2011, CNOOC issued yet another press release stating that Conoco's latest estimate of spilled oil was 3,217 barrels.  (Id. ¶ 57.)  That press release also stated that Conoco reported that it had "recovered" approximately 2,100 barrels of oil from the seabed and surface to date.  (Id.)  As with CNOOC's other post-spill press releases, this one again concluded that CNOOC would "continue to urge and assist" Conoco in clean-up efforts.  (Id.)

Two weeks later, on August 24, 2011, CNOOC issued additional press releases.  These releases reported that CNOOC's production in the first half of 2011 netted 168.7 million barrels; that CNOOC was "reset[ting]" its production target to 331 to 341 million barrels (down from its initial estimate of 355 to 365 barrels); that CNOOC had "initiated the emergency response system in a timely manner," and had "actively supported" Conoco in regard to PL 19-3 oil spill clean-up efforts; and,

8

of course, that CNOOC would "continue to urge and assist" Conoco in clean-up efforts. (Id. ¶¶ 72, 73.) On the same day, a CNOOC executive stated during an investor presentation that "according to [Conoco's] disclosed information, 95% of the spill situation has been contained and controlled." (Id. ¶ 59.)[8]

SOA, however, was apparently not satisfied. On September 2, 2011, SOA directed Conoco to suspend all oil production activities at the entire PL 19-3 oilfield, based on the fact that Conoco had "neither completely screened out the oil spill risk nor completely sealed the sources of oil spillage." (Id. ¶ 64.) CNOOC's September 4, 2011 press release reporting SOA's directive noted that the suspension of production would reduce CNOOC's overall production by some 40,000 barrels per day--in addition to the 22,000 barrel-per-day reduction caused by the prior suspension of activities at Platforms B and C. (Id. ¶ 65.)

Plaintiffs allege that CNOOC's statements from July 6, 2011--the date of CNOOC's first post-spill statement--to August 24, 2011--the date of CNOOC's last alleged misstatement--were false and misleading because (1) the oil spills were not under control; (2) CNOOC's use of its affiliated Chinese company to handle clean-up efforts--discussed further infra--was "delaying" those efforts "and causing further damage"; and (3) CNOOC's risk- and emergency-management measures were generally inadequate. (See id. ¶¶ 54, 60, 74.)

_____

[8] The complaint attributes this quotation to "an unidentified Company representative," and does not further identify who made the comment, or when, where, how, or under what circumstances it was made. (See Compl. ¶ 59.) CNOOC's motion papers explain that this comment was made by CNOOC's then-president during an investor presentation. (See Def.'s Mem. (ECF No. 22) at 7.)

9

## Fallout

The first trading day for CNOOC ADSs after CNOOC's September 4, 2011 press release was September 6, 2011.  By the end of September 6, CNOOC's ADSs had declined some thirteen percent in value from their prior closing price.  (Id. ¶¶ 66, 69.)  The complaint does not allege why the class period ends on September 16, 2011--nor does it allege any statements from any individual or entity, or any events, occurring on September 16, 2011.[9]  It does allege, in a vague and conclusory manner, and without citing to any authority or identifying any dates, that "when the Defendants' prior misrepresentations and fraudulent conduct became apparent to the market through a series of disclosures, the price of CNOOC ADSs . . . declined 37% from their Class Period high."  (Id. ¶ 81.)[10]

Moreover, oil allegedly continued to leak from PL 19-3's Platform C at least through November 2011.  (Id. ¶ 77.)  Indeed, the SOA Report--eventually issued in June 2012--concluded that the PL 19-3 oil spills had caused widespread environmental and ecological damage; that PL 19-3, in plaintiff's words, had been

---

[9] Plaintiffs' original complaint attaches a certification from plaintiff Sinay stating that his last purchase of CNOOC ADSs was on September 15, 2011.  (See ECF No. 1 at unnumbered page 20.)  This certification is not attached to the operative amended complaint.

[10] The complaint does allege that CNOOC issued a press release on September 18, 2011, which caused a four percent stock price drop on September 19.  (Compl. ¶¶ 70, 71.)  It also alleges that "[o]n November 11, 2011, CNOOC finally revealed to the public that there had been defects in the procedures and management of PL 19-3" by releasing the conclusions of an investigation conducted by SOA and several other Chinese government entities.  (Id. ¶ 78; see also id. ¶ 58.)  Moreover, it alleges that the SOA released its SOA Report in June 2012.  (Id. ¶ 79.)  It does not, however, allege any revelation or any statement on September 16, 2011.  Nor does it allege anything about CNOOC's stock price between September 6, 2011, and September 19, 2011, except for the vague statement, referring to no dates, that "shares [of CNOOC ADSs] declined 37% from their Class Period high."  (Id. ¶ 81.)

"negligently operated"; and that, again in plaintiff's words, "no necessary precautionary measures were taken regarding foreseeable risks." (Id. ¶¶ 34, 79.)

**Allegations Concerning Scienter**

Plaintiffs allege that during the class period, CNOOC knew or should have known that the statements detailed supra were false or misleading for several reasons. First, plaintiffs assert that CNOOC's April 8, 2011 statement that CNOOC was investigating its oil rigs to identify and prevent drilling-related risks is belied by the SOA Report's conclusion that precautionary measures regarding foreseeable risks were not taken. (See Pls.' Opp'n (ECF No. 23) at 16-18 and n.8.) Plaintiffs do not, however, explain whether or how the SOA Report has significance regarding CNOOC's knowledge. There is not any necessary logical connection between the SOA Report's alleged conclusion that required precautionary measures were not taken and CNOOC knowing its investigations would not identify and/or prevent the risks leading to the PL 19-3 spills. And the SOA Report itself is not included as an exhibit to the complaint or to any other filing in this case--nor does it appear to be publically available. Nor do plaintiffs point to, or even allege, the existence of any documentary or other evidence available before or during the oil spill contradicting CNOOC's pre-spill statements.[11]

---

[11] Plaintiffs argue that contradictory information was available to CNOOC because CNOOC was, allegedly, investigating its rigs, and that that contradictory information was what was revealed in the SOA Report. (See Pls.' Opp'n at 19 n.9 ("Plaintiff has alleged with particularly both the availability of contradictory reports (CNOOC regularly conducted safety inspections **prior to and/or during** the Class Period) and the content of those reports (the SOA Report disclosed the reckless management of PL 19-3 **during** the Class Period.)" (emphasis in original).) But the factual content of the SOA Report alleged by plaintiffs are the "hows" and "whys" regarding what caused the oil spills, summarized supra at pages 5 and 6--e.g., that Platform B's "water injection" and Platform C's "cuttings reinjection" operations were problematic. The issue is not whether those operations were

11

Plaintiffs also allege that CNOOC must have known that PL 19-3 was being operated in an unsafe manner because (1) CNOOC, with Conoco, sat on PL 19-3's joint management committee and adopted its overall development plan; (2) CNOOC conducted safety inspections of PL 19-3 prior to the spills; and (3) CNOOC, with Conoco, was active in post-spill clean-up efforts. (Pls.' Opp'n at 19-20.)  Again, however, plaintiffs fail to make or point to specific allegations for example indicating that CNOOC knew that PL 19-3's operations were not in compliance with the overall development plan; that CNOOC's safety inspections revealed any safety risks; or that any information learned during CNOOC's post-spill clean-up efforts and available to CNOOC undermined its statements about the progress of those efforts.

Finally, plaintiffs allege that CNOOC must have known its post-spill statements regarding the effectiveness of it and Conoco's clean-up efforts were false when made because CNOOC required that clean-up efforts be handled by a Chinese company affiliated with CNOOC instead of by an American company affiliated with Conoco. (Pls.' Opp'n at 20.)  Specifically, plaintiffs allege that Conoco had complained to the United States Government in 2007, four years prior to the spills, that CNOOC's Chinese affiliate "limited [Conoco's] ability to deal with an environmental disaster in China." (Compl. ¶¶ 75-76.)

---

problematic when CNOOC was reporting that it was conducting inspections to identify and head off risks. The issue is that the SOA Report's conclusion as alleged was not contemporaneously reached by or in any document or report known to CNOOC. Plaintiffs' attempt to bootstrap the SOA Report's conclusion--arrived at one year after the oil spills--into CNOOC's contemporaneous corporate knowledge must fail as a matter of law.

LEGAL STANDARDS

**Rule 12(b)(6)**

To survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Alt. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570). See also Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (same). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. In applying that standard, the court accepts as true all well-plead factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Id. If the court can infer no more than "the mere possibility of misconduct" from the factual averments--in other words, if the well-pleaded allegations of the complaint have not "nudged claims across the line from conceivable to plausible," dismissal is appropriate. Twombly, 550 U.S. at 570; Starr, 592 F.3d at 321 (quoting Iqbal, 129 S. Ct. at 1950).

13

## Scienter Requirement in Exchange Act § 10(b) and Rule 10(b)(5) Actions

Plaintiffs bringing Exchange Act section 10(b) and Rule 10(b)(5) claims "must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. American Express Co., 724 F. Supp. 2d 447, 458 (S.D.N.Y. 2010) (quoting ATSI Commc'ns, 493 F.3d at 105 (2d Cir. 2007)). "Plaintiffs must also 'satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires that the circumstances constituting fraud be stated with particularity.'" Tyler v. Liz Claiborne, Inc., 814 F. Supp. 2d 323, 334 (S.D.N.Y. 2011) (alteration omitted) (quoting American Express, 724 F. Supp. 2d at 458); see also Novack v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (same)). "Plaintiff[s] cannot base securities fraud claims on speculation and conclusory allegations." Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 297 (S.D.N.Y. 2010) (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)).

The Private Securities Litigation Reform Act ("PSLRA"), moreover, requires that plaintiffs plead scienter by alleging "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Liz Claiborne, 814 F. Supp. 2d at 334 (quoting ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009)) (emphasis in original); see also 15 U.S.C. § 78u-4(b)(2). In cases brought under

14

section 10(b) and Rule 10(b)(5), that "required state of mind is 'a mental state embracing intent to deceive, manipulate, or defraud.'" Fort Worth Employers' Retirement Fund v. Biovail Corp., 615 F. Supp. 2d 218, 225 (S.D.N.Y. 2009) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007)). A "strong inference" of scienter "must be 'more than merely plausible or reasonable--it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" JP Morgan, 553 F.3d at 198 (quoting Tellabs, 551 U.S. at 314). Thus, the Court "must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged," and "must assess whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Liz Claiborne, 814 F. Supp. 2d at 334 (internal quotation marks omitted) (quoting JP Morgan, 553 F.3d at 198; American Express, 724 F. Supp. 2d at 458).

The scienter required in section 10(b) and Rule 10(b)(5) actions "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." JP Morgan, 553 F.3d at 198.[12] However, "[w]hen

---

[12] Here no motive is alleged, and thus, but for this footnote, the Court will not further address the issue. "Motive and opportunity" scienter pleading refers to allegations that defendants benefitted in some personal manner from the fraud alleged, such that the benefit was not simply to keep stock prices high or to increase individuals' compensation, but instead was something "unique" and "concrete" specifically enabled by the fraud in question. Liz Claiborne, 814 F. Supp. 2d at 335 (quoting JP Morgan, 553 F.3d at 198; In re SLM Corp. Sec. Litig., 740 F. Supp. 2d 542, 557 (S.D.N.Y. 2010)). For example, "unusual" or "suspicious" insider defendant stock sales from which increased profits were realized due to fraudulently-inflated stock prices might suffice. Id. (citing In re Citigroup Inc. Sec. Litig., 753 F. Supp. 2d 206, 233 (S.D.N.Y. 2010); In re Gildan Activewear, Inc.

motive is not apparent . . . the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater." In re Citigroup Inc. Sec. Litig., 753 F. Supp. 2d 206, 233 (S.D.N.Y. 2010). Defendants' conduct must be "highly unreasonable and [ ] represent[] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Liz Claiborne, 814 F. Supp. 2d at 336 (quoting Gissin v. Endres, 739 F. Supp. 2d 488, 503 (S.D.N.Y. 2010)).

Plaintiffs argue that CNOOC's safety investigations must have revealed to CNOOC that its oil rigs were being operated in an unsafe manner. Such allegations require that plaintiffs "specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements." Gissen, 739 F. Supp. 2d at 503. Thus, plaintiffs "must specifically identify the reports or statements that are contradictory to the statements made, or must provide specific instances in which [d]efendants received information that was contrary to their public declarations," and that "was available to the defendants [ ] at the same time they made their misleading statements." Liz Claiborne, 814 F. Supp. 2d at 336 (internal quotation marks omitted) (citing Canadian Imperial Bank, 694 F. Supp. 2d at 299; In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009)) (emphasis in original); see also American Express, 724 F. Supp. 2d at 462

---

Sec. Litig., 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009)). Plaintiffs do not make any allegations concerning CNOOC's motive to perpetuate a fraud on its ADS investors. Cf. JP Morgan, 553 F.3d at 198 ("the facts alleged must support an inference of an intent to defraud the plaintiffs rather than some other group") (citing Kalnit, 264 F.3d at 140-41) (emphasis added).

16

(allegations that "information was [of] the sort" that "would have been reviewed by [defendants] are too speculative to give rise to a strong inference of scienter" and "offer nothing concrete and are not allegations of fact").  Contrawise, "specific identification of reports or other documents indicating defendants' recklessness as to their public statements' truth or falsity suggests an inference of scienter strong enough to survive a motion to dismiss." Liz Claiborne, 814 F. Supp. 2d at 336-37 (collecting cases); see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196-97 (2d Cir. 2008) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").

"Finally, the law is clear" that plaintiffs' allegations not only must show strong circumstantial evidence of conscious misbehavior or recklessness, but also must satisfy "Tellabs' requirement that the inference [of scienter] drawn from the facts is at least as compelling as any other rational inference." Liz Claiborne, 814 F. Supp. 2d at 337.  In other words, "[r]egardless of the manner in which a plaintiff attempts to plead scienter, at the end of its evaluation, this Court must be convinced that the inference of scienter is at least as compelling as any competing inferences." Biovail, 615 F. Supp. 2d at 225 (internal quotation marks omitted).

17

DISCUSSION

Plaintiffs argue that a strong inference of scienter should be drawn from the following allegations: (1) the SOA Report's conclusion that sufficient precautionary measures were not taken; (2) the SOA Report's summary of what, factually, occurred before and during the PL 19-3 oil spills; (3) that CNOOC, with Conoco, sat on PL 19-3's joint management committee and adopted its overall development plan; (4) that CNOOC conducted safety inspections of PL 19-3 prior to the spills; (5) that CNOOC, with Conoco, was active in post-spill clean-up efforts; and (6) that CNOOC required Conoco to use a Chinese CNOOC-affiliate for clean-up efforts instead of an American company affiliated with Conoco, when Conoco had complained four years prior that CNOOC's Chinese affiliate "limited [Conoco's] ability to deal with an environmental disaster in China." (See Pls.' Opp'n at 16-20; Compl. ¶ 75.) These are insufficient to support plausible allegations of scienter.

The first two items listed supra--the scienter allegations based on the SOA Report--are allegations concerning information from a hindsight-based viewpoint. Such allegations are classically insufficient to support a strong inference of scienter absent well-pleaded and plausible factual allegations about what specific information contradicting CNOOC's public statements was available to CNOOC at the time those statements were made. See e.g., Dynex Capital Inc., 531 F.3d at 196-97. As this Court has recently recognized, it is no doubt the case that "plaintiffs may rely on post-class period statements to confirm what a defendant should have known during the class period." IBEW Local 90 Pension Fund v. Deutsche Bank

18

AG, 11 Civ. 4209, 2013 WL 1223844, at *12 (S.D.N.Y. Mar. 27, 2013) (alterations omitted). But this proposition has significance only when contradictory information is properly alleged to have been available to defendant in the first place--i.e., only when the post-class period statements actually do confirm what defendant knew or should have known. Id. at *13 (noting the "multiple references to information available to senior management, specific questions asked by, and presentations made to senior management, all of which contradicted the public-facing statements").[13]

In the complaint in the case at bar, there are no specific references to any information available to CNOOC or to anyone at CNOOC that contradicted CNOOC's statements that it was conducting inspections, that it was performing measures to identify and prevent risks, that it had adopted emergency plans to deal with oil spills, or that according to Conoco the PL 19-3 spills were mostly contained or of a certain magnitude. There is not, for example, any allegations concerning information available to CNOOC suggesting that its inspections and plans were not or would not be effective. Nor is there any allegation concerning information available to CNOOC suggesting that Conoco's estimates of the spills' magnitude

---

[13] This Court has also recently recognized that recklessness-based scienter allegations can be inferred when a fraud is so massive and inescapable that it is simply implausible that one acted in a non-reckless manner. Thus, in In re Puda Coal Sec. Inc., et al. Litig., this Court ruled that a complaint adequately pleaded scienter against a Chinese coal company's auditor when the auditor had not discovered in conducting its audit that the entirety of the coal company's business had been transferred, for no consideration, to one of the company's insiders. (See Hr'g Tr., In re Puda Coal Sec. Inc., et al. Litig., 11 Civ. 2598 (Mar. 13, 2013) (ECF No. 155) at 40-45 ("There are situations where you would have found a fraud and there are situations where you would find that the entire company was missing. And here the allegation is that there was such a massive fraud. . . . It's just not a piece of it [that] you might have missed [ ]. It is that the business was gone. The business had been moved.").) The case at bar, however, does not present "such a massive fraud" as that the inference of recklessness is inescapable.

19

was incorrect.  Moreover, to the extent plaintiffs argue that CNOOC's inspections must have revealed that CNOOC's safety measures were in some way inadequate, such an argument fails on well-settled law.  See e.g., American Express, 724 F. Supp. 2d at 462 (allegations that "information was [of] the sort" that "would have been reviewed by [defendants] are too speculative to give rise to a strong inference of scienter" and "offer nothing concrete and are not allegations of fact"); PXRE, 600 F. Supp. 2d at 538 ("Plaintiff argues that the individual Defendants must have known of Matusiak's concerns, due to their positions in PXRE, and due to PXRE's 'intimate corporate culture.'  The Court finds that such allegations fail to support an inference that Defendants knew, or had access to, Matusiak's concerns.") (emphasis in original).  The SOA Report itself is not included, nor is any quotation from its text, in the complaint or in any filing made with the Court.  And the Court is not presented with any information from the SOA Report or another source indicating that CNOOC ever had information contradicting its public statements.  Quite simply, there is not a single allegation in the complaint specifically identifying any information known to CNOOC at the time CNOOC made any of its allegedly false statements undermining the accuracy of those statements in any way.

The third, fourth, and fifth items listed above--that CNOOC sat on PL 19-3's joint management committee, that CNOOC conducted safety inspections, and that CNOOC was active in post-spill clean-up efforts--fail for essentially the same reasons.  These are allegations about what CNOOC did; they are not allegations about what CNOOC knew.  There is not, for example, any allegation about what

information was known to the joint management committee, what reports or presentations were given to that committee, or even what anyone on the committee might have said indicating that the committee had knowledge contradicting CNOOC's public statements. Nor is there an allegation even that CNOOC's involvement in post-spill clean-up efforts revealed to CNOOC that the spills were not under control or that CNOOC's report of Conoco's estimates of spill magnitude were wrong--much less non-conclusory, specific, and well-pleaded allegations of facts showing any of that. Nor is there any allegation about what, if anything, was revealed during CNOOC's safety inspections. Again, to the extent plaintiffs allege CNOOC's inspections revealed certain information that CNOOC "must have known," this allegation is inadequate.

Indeed, the only allegation going to scienter for which any contradictory information is specifically alleged to have been available is the allegation that CNOOC's Chinese affiliate could not, in fact, effectively handle post-spill clean-up. According to the complaint, Conoco complained to the United States government in 2007 that CNOOC's insistence on using its Chinese affiliate "limited" Conoco's ability to manage environmental disasters in China. (Compl. ¶ 75.) Thus, the argument goes, CNOOC had "information" contradicting its public statements, inter alia, that the PL 19-3 spills were "basically under control." (See id. ¶ 53.)

This allegation sitting alone, however, does not a strong inference of scienter support. First, the complaint does not allege that whatever it was that gave Conoco

21

pause in 2007[14] still existed and/or was known to CNOOC in 2011. Nor indeed is there any allegation, for example, that CNOOC's Chinese affiliate was in fact in any way ineffective in dealing with the PL 19-3 spills for any reason identified by Conoco in 2007. In fact, there is not even any allegation that CNOOC's Chinese affiliate has ever actually been ineffective in containing and cleaning up any oil spill. The most the complaint alleges is that CNOOC's Chinese affiliate was "undoubtedly" not equipped to deal with an oil spill of the magnitude of the PL 19-3 spills. (See id. ¶ 76.) But the complaint does not allege a single fact detailing any way in which CNOOC's Chinese affiliate in fact acted in some inadequate manner in responding to those spills.

Moreover, the allegation concerns Conoco's opinion as to CNOOC's affiliate's effectiveness expressed four years prior to the relevant time that that affiliate's effectiveness was eventually tested. Considering that CNOOC is "the largest producer of offshore crude oil and natural gas . . . in the world" (id. ¶ 23), the more compelling inference--which the Court is required to consider under Tellabs--is that CNOOC heard Conoco's complaint and urged or caused its affiliate to make necessary changes. In sum, there again can be simply no strong inference that CNOOC's public statements--about it and Conoco's control of the spill situation-- were made with known or reckless disregard to their truth or falsity due to the sole fact that Conoco had complained to the United States government four years prior about a certain aspect of CNOOC's disaster-response mechanisms.

---

[14] What that might have been--i.e., how CNOOC's Chinese affiliate was inadequate--is not alleged.

22

## CONCLUSION

For the reasons stated above,[15] the Court GRANTS defendant's motion to dismiss in its entirety.

At the status conference on February 20, 2013, the Court explicitly stated that any ruling on the pending motion to dismiss would be the Court's final ruling--and that therefore any dismissal would be with prejudice. For this reason, the Court extended plaintiffs the opportunity to again amend their complaint, having at that point seen the arguments advanced by CNOOC in support of dismissal. Plaintiffs declined this opportunity. (See ECF No. 26.) Accordingly, this dismissal is with prejudice.

The Clerk of the Court is directed to terminate this motion (ECF No. **20**), and to terminate this case.

SO ORDERED.

Dated:      New York, New York
            May 6, 2013

K. B. Forrest

KATHERINE B. FORREST
United States District Judge

---

[15] The Court notes that the reasons stated above merely represent one especially clear reason to dismiss plaintiffs' complaint. Another likely reason is that plaintiffs fail, for the vast majority of the statements in question, to allege falsity. The fact that an oil spill occurred allegedly because of anomalies due to "water injection" and "cuttings reinjection" pressures in certain wells--and allegedly because of the responses to those anomalies--is not necessarily inconsistent with the truth of CNOOC's statements (1) that it was committed to safety and environmental protection; (2) that it was investigating its wells to help identify and prevent risks; (3) that it was taking proper measures to identify and prevent risks; or (4) that it had plans in place to deal with oil spills. Nor is the fact that the oil spill eventually reached upwards of 3,200 barrels necessarily inconsistent with the truth of CNOOC's statements (1) that Conoco--not CNOOC--initially estimated that the spills were of a lesser amount; (2) that CNOOC, with Conoco, was working on clean-up efforts; or (3) that the spills were under control. Ocean oil rig disasters involve large quantities of oil invading the ocean ecology. This is simply a sad fact of life.